Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Priscilla D. Kam, Esq.
Margaret Iocco, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO                Docket No.: _____(        )
CASUALTY COMPANY,

                                                    Plaintiffs

                                  - against -

JP RX CORP, ABDUGANI NABIEV, and JOHN DOE
DEFENDANTS 1-5,

                                                    Defendants.
--------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants JP RX CORP., Abdugani Nabiev, and

John Doe Defendants "1" through "5" (collectively, "Defendants"), hereby allege as follows:

1.      This action seeks to terminate a fraudulent scheme perpetrated by the Defendants

who have exploited the New York "No-Fault" insurance system by submitting, or causing to be

submitted, hundreds of fraudulent charges to GEICO for medically unnecessary "pain relieving"

topical prescription drug products along with other excessive pharmaceutical products (collectively, the "Fraudulent Pharmaceuticals") that JP RX CORP ("JP RX") purportedly dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").

2.      Defendants JP RX and its owner, Abdugani Nabiev ("Nabiev"), intentionally targeted a set of select topical pain products, including Pennsaid 2% diclofenac solution, lidocaine 5% ointment, and diclofenac 3% gel (collectively, the "Fraudulent Topical Pain Products") in order to submit fraudulently inflated charges to GEICO.  The Defendants targeted the Fraudulent Topical Pain Products and dispensed them in place of other effective, but much-less costly prescription and non-prescription drug products because the Defendants were able to acquire the Fraudulent Topical Pain Products at low cost and bill for them through JP RX at exorbitant prices pursuant to predetermined protocols.

3.      In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with a limited number prescribing healthcare providers (the "Prescribing Providers"), and persons ("Clinic Controllers") who work at or are associated with certain multidisciplinary medical clinics that almost exclusively treated No-Fault patients ("No-Fault Clinics"), and steered them to prescribe and direct large volumes of prescriptions to JP RX for the Fraudulent Pharmaceuticals in exchange for kickbacks and without regard for genuine patient care.

4.      Not surprisingly, a recently unsealed federal indictment identified JP RX as one of a series of pharmacies used to defraud federal health insurance programs involving the submission of approximately $6.9 million in fraudulent pharmaceutical claims, effectuated through a complex scheme involving deception, fictitious entities, and money laundering.  See U.S.A. v. Khaim, et al., 1:20-cr-00580(AMD)(RML) (E.D.N.Y. 2020).

5.      The scheme here spearheaded by the Defendants egregiously inflated the charges submitted to GEICO and other New York No-fault insurance companies.  For example, JP RX and Nabiev billed as much as $2,631.40 for a single dispenser of Pennsaid 2% diclofenac solution, $1,527.50 for a single tube of lidocaine 5% ointment, and $1,891.00 for a single tube of diclofenac 3% gel, while also billing for other unnecessary Fraudulent Pharmaceuticals.  The Defendants did this knowing that there were a wide range of similar or more effective medications available at a fraction of the cost, including over-the-counter medications, which could have been dispensed to the Insureds.

6.      By this action, GEICO seeks to recover more than $508,900.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to JP RX of over $400,700.00 in pending fraudulent No-Fault claims for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted through JP RX because:

(i)     JP RX billed for Fraudulent Pharmaceuticals that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to JP RX in exchange for unlawful kickbacks and other financial incentives; and

(iii)   the Defendants intentionally targeted a specific set of pharmaceutical products, including the Fraudulent Topical Pain Products, that they acquired at low cost, and caused JP RX to dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to fraudulently inflate the charges to GEICO.

(iv)    The Defendants made false statements on registration, licensing, and application documents filed with the New York State Education Department Board of Pharmacy (the "NYS Pharmacy Board") and failed to comply with material licensing laws, rendering JP RX ineligible to bill to collect No-fault benefits.

7.     The Defendants fall into the following categories:

(i)     JP RX is a New York corporation engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals to patients and then submitted bills to GEICO and other New York automobile insurers for reimbursement to which it is not entitled;

(ii)    Nabiev is the purported owner of JP RX;

(iii)   John Doe Defendants "1" through "5" are persons and entities, presently not identifiable, who are not and never have been licensed healthcare professionals but who, along with Nabiev, participated in the operation and control of JP RX and facilitated the illegal, collusive relationships with the Prescribing Providers and the Clinic Controllers.

8.     The Defendants' scheme began in 2020 and has continued uninterrupted to the present day.  As discussed more fully below, the Defendants at all times have known that: (i) JP RX billed for Fraudulent Pharmaceuticals that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to JP RX in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products, including the Fraudulent Topical Pain Products, that they acquired at low cost, and had JP RX dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to fraudulently inflate the charges to GEICO; and (iv) the Defendants made false statements on registration, licensing, and application documents filed with the NYS Pharmacy Board and failed to comply with material licensing laws.

9.     Based on the foregoing, JP RX does not now have – and has never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.

The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $508,900.00.

## THE PARTIES

### I.    Plaintiffs

10.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

11.    Defendant JP RX is a New York corporation, incorporated on or about December 19, 2019, with its principal place of business at 76-18 Jamaica Avenue, Jamaica, New York.

12.    JP RX became registered as a pharmacy with the New York State Education Department Office of the Professions on March 11, 2020.

13.    JP RX's registration was transferred from Maccabi Pharmacy RX Inc. ("Maccabi Pharmacy"), which was a named defendant in a federal affirmative fraud action commenced by GEICO captioned, GEICO v. Maccabi Pharmacy RX Inc., et al., 1:21-cv-01097-FB-RLM (E.D.N.Y. 2021).

14.    JP RX and Maccabi Pharmacy both operated out of 76-18 Jamaica Avenue, Jamaica, New York, where the awning still read "Maccabi Pharmacy Rx" as of December 2020 and after JP RX began operating.

15.    Defendant Nabiev resides in and is a citizen of New York.  Nabiev is the purported owner of JP RX.

16.    JP RX's registration with the New York State Education Department Office of the Professions indicates that it has no supervising pharmacist.  Identification and employment of a supervising pharmacist is required for a pharmacy to operate in the State of New York if the pharmacy is not owned by a licensed pharmacist, as is the case with JP RX – yet JP RX continues to try and collect on pending fraudulent claims submitted to GEICO.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

18.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

19.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.    An Overview of New York's No-Fault Laws

21.    GEICO underwrites automobile insurance in the State of New York.

22.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

23.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

24.     The No-Fault Laws limits reimbursement for benefits to prescription drugs only. over-the-counter drugs and products which may be purchased without prescription are not covered expenses under the No-Fault Laws.

25.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

26.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

27.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

28.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially valid license to determine whether there was a failure to abide by state and local law.

29.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     <u>An Overview of Applicable Licensing Laws</u>

30.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

31.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

32.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications based patient comorbidities, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

33.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies are prohibited from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

34.     Pursuant to 8 N.Y.C.R.R. § 63.1(7)(ii), when a prescription is delivered to the patient off the premises of a pharmacy through mail delivery, a delivery service or otherwise, the pharmacy shall, among other things, include with each prescription a written offer to counsel the patient or person authorized to act on behalf of the patient who presents the prescription.

35.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

36.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

37.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment,

rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

38.     New York Education Law § 6810 prohibits persons authorized to issue prescriptions for a drug from issuing prescriptions on a prescription form which provides for the dispensing or compounding of any other drug, and no drug shall be dispensed by a pharmacist when such prescription form includes any other drug.

39.     Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

40.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

41.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

42.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

III.     **The Defendants' Scheme Involving Fraudulent Pain Products**

43.     Beginning in 2020, the Defendants, including JP RX, Nabiev, and John Doe Defendants "1" through "5", implemented a fraudulent scheme in which they used JP RX to bill

the New York automobile insurance industry for millions of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to the Insureds.

44.     As part of the fraudulent scheme, JP RX purported to be a small, neighborhood pharmacy purportedly owned by Nabiev.

45.     Despite purporting to be a storefront neighborhood pharmacy, JP RX was created, established, and operated solely to commit fraud without regard for compliance with any of the pharmacy licensing requirements intended to ensure, among other things, that pharmacies are legitimately owned and controlled, operated for the proper conduct of pharmacy in good moral character, and not used to exercise undue influence on patients or others to exploit patients for financial gain.

46.     In fact, JP RX was identified as being part of a massive scheme to defraud federal health insurance programs spearheaded by Peter Khaim and Arkadiy Khaimov, who illegally controlled JP RX and twelve other pharmacies in order to submit approximately $6.9 million in fraudulent pharmaceutical claims to Medicare and Medicaid.  See U.S.A. v. Khaim, et al., 1:20-cr-00580(AMD)(RML) (E.D.N.Y.).

47.     JP RX first became registered to operate as a pharmacy in New York State on March 11, 2020.

48.     JP RX's registration documents filed with the New York State Education Department Board of Pharmacy omitted any mention of the involvement of Peter Khaim and Arkadiy Khaimov with the operations of the pharmacy.

49.     Once it began operating, JP RX did not engage in any legitimate advertising to the public, maintained no website, and did virtually nothing that would be expected of a legitimate pharmacy to develop its reputation, attract customers, and draw legitimate business.

50.     Despite that fact, JP RX billed GEICO alone more than $1,092,500.00 for only eight pharmaceutical products and on only 33 dates of service between September 22, 2020 and December 18, 2020.

51.     Despite purporting to be a neighborhood pharmacy catering to the needs of the local population, prescriptions for the Fraudulent Topical Pain Products containing diclofenac and/or lidocaine (i.e., Pennsaid 2% diclofenac solution, lidocaine 5% ointment, and diclofenac 3% gel) constituted more than 97% of the billing JP RX submitted to GEICO.

52.     Not surprisingly, the U.S. Department of Health issued a report which noted that pharmacies with questionable billing primarily billed for compounded topical drugs containing lidocaine and diclofenac, and that the "OIG has previously raised concern about potential fraud and abuse related to both diclofenac and lidocaine." See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

53.     The Defendants knew that there was no legitimate reason that JP RX received voluminous prescriptions containing diclofenac and/or lidocaine over the course of only three months; knew that there was no legitimate medical need for the exorbitantly priced Fraudulent Topical Pain Products to be dispensed to the Insureds; and knew that there existed a wide range of inexpensive, over-the-counter products of similar efficacy that could have been dispensed to Insureds.

54.     The Defendants obtained voluminous prescriptions over the course of only three months because the Defendants were using JP RX solely to commit fraud and because they steered a limited number of Prescribing Providers and the Clinic Controllers associated with the No-Fault Clinics to prescribe large volumes of prescriptions to JP RX for the targeted set of Fraudulent

Topical Pain Products and other Fraudulent Pharmaceuticals, pursuant to predetermined protocols, and in exchange for kickbacks and other compensation.

55.     As part of the collusive relationships among the Defendants, the Prescribing Providers, and the Clinic Controllers, the Prescribing Providers – operating from No-Fault Clinics that treated thousands of Insureds – purported to prescribe the medically unnecessary and illusory Fraudulent Pharmaceuticals to the Insureds, while intentionally ignoring a vast array of prescription and over-the-counter medications readily available at a fraction of the cost.

56.     As a further part of the collusive relationships among the Defendants, the Prescribing Providers, and the Clinic Controllers, the Clinic Controllers then directed the prescriptions for the Fraudulent Pharmaceuticals to JP RX, so it could bill GEICO for huge sums as part of a scheme to exploit the Insureds for financial gain, without regard to genuine patient care.

57.     The No-Fault Clinics from where the prescriptions steered to JP RX were generated included clinics that housed a "revolving door" of numerous other purported healthcare providers geared towards exploiting New York's No-Fault insurance system.  For example, GEICO has received billing from more than 40 different healthcare providers for healthcare goods and services rendered at a No-Fault Clinic located at 3250 Westchester Avenue, Bronx, New York, which was a major source of prescriptions that JP RX submitted to GEICO in support of its charges.

58.     GEICO has also received billing from more than 30 different healthcare providers for healthcare goods and services rendered at a No-Fault Clinic located at 332 East 149th Street, Bronx, New York, which was another major source of prescriptions that JP RX submitted to GEICO in support of its charges.  Upon information and belief, this was one of the No-fault Clinics at issue in United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG) (S.D.N.Y.) ("USA

v. Rose"), wherein numerous individuals were indicted for paying bribes to 911 operators, medical personnel, NYPD officers, and others in exchange for confidential patient information that was used to steer the patients to a network of medical clinics (and lawyers) where the clinic controllers paid kickbacks in exchange for the referrals.

59.     Further, one of the Prescribing Providers who steered numerous prescriptions for the Fraudulent Pharmaceuticals to JP RX was associated with Metro Pain Specialists P.C., a professional corporation that has been named as a defendant in multiple affirmative fraud cases involving fraudulent services billed to No-fault insurers, including State Farm Mut. Ins. Co. v. Metro Pain Specialists, P.C., et al, 21-cv-05523 (E.D.N.Y. 10/5/2021) and Allstate Ins. Co. v. Metro Pain Specialists P.C., et al., 21-cv-05586 -DG-RER (E.D.N.Y. 10/7/2021).

60.     In keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to a fraudulent treatment protocol, the Defendants provided certain of the Prescribing Providers with a template form containing the names of the Fraudulent Pharmaceuticals. The Prescribing Providers then used the template forms to prescribe the Fraudulent Pharmaceuticals to Insureds.

61.     The Defendants provided certain Prescribing Providers and Clinic Controllers with the template forms to steer the Prescribing Providers and Clinic Controllers to prescribe, or cause the prescription of, as many prescriptions as possible for the Fraudulent Pharmaceuticals, in exchange for kickbacks and other financial incentives.

62.     A representative sample of the prescriptions issued by the Prescribing Providers using template forms, which JP RX submitted to GEICO in support of its fraudulent billing, is annexed hereto as Exhibit "2".

63.     Under New York law, JP RX was prohibited from dispensing based on the template forms, which are invalid and illegal because, among other things, no single prescription should provide for the dispensing of multiple drugs and such template prescription forms amount to illegal steering of pharmaceuticals.

64.     Moreover, in keeping with the fact that Defendants established JP RX to exploit the Insureds' No-Fault Benefits, without regard to genuine needs of the Insureds, JP RX made no effort to promptly deliver the Fraudulent Pharmaceuticals to Insureds and instead often purported to deliver them almost two weeks after the medications were prescribed, to the extent they were even delivered at all.

65.     In short, the Fraudulent Pharmaceuticals dispensed by JP RX and prescribed by the Prescribing Providers and their associates working in collusion with JP RX, served no purpose other than to exploit the Insureds' No-Fault Benefits to financially benefit the Defendants.

66.     The Defendants established JP RX and chose to target the Fraudulent Topical Pain Products because similar over-the-counter drugs that could be dispensed to Insureds were not covered expenses under the No-Fault Laws. However, the Defendants could acquire the Fraudulent Topical Pain Products at low cost and submit large volumes of claims for reimbursement at exorbitant prices by steering medically unnecessary prescriptions to JP RX.

67.     JP RX submitted its voluminous billing to GEICO for the Fraudulent Pharmaceuticals in approximately four months, and despite collecting hundreds of thousands of dollars from GEICO (and likely millions of dollars from all New York automobile insurers) over a period of four months, suddenly stopped submitting billing to GEICO in January 2021.

68.     Despite suddenly ceasing the submission of large volumes of billing to GEICO, JP RX remains as an active corporation and Defendants continue their fraudulent scheme by hiring

law firms to pursue collection of the unpaid fraudulent charges submitted to GEICO through numerous separate No-Fault arbitration or civil court collection proceedings.

69.     The Defendants' continued collection efforts through separate No-Fault arbitration or civil court collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a No-Fault arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription, steering, and dispensing of fraudulent pharmaceutical products to hundreds of patients across numerous different clinics located throughout the metropolitan area.

**A**.     **The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care in Order to Exploit Patients for Financial Gain**

70.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, the Insureds treated by the Prescribing Providers who prescribed pharmaceuticals dispensed by JP RX were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

71.     Evidence-based best practice guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized,

then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

72.     More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom these medications are clinically appropriate.

73.     Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

74.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example, patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

75.     Despite these guidelines and the basic goal of helping patients get better in a timely fashion, the Insureds who received pharmaceuticals from JP RX, and who were treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers, were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

76.     As part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the providers at the No-Fault Clinics purported to render to the Insureds. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products, primarily in the form of the exorbitantly priced Fraudulent Topical Pain Products.

77.     To the extent any examination was performed, the Prescribing Providers at times failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.  In the event a medical history was documented, such history was not considered and had no influence on the Prescribing Provider's recommended treatment plan for the patient including whether to prescribe Fraudulent Pharmaceuticals dispensed by JP RX.

78.     Prescribing the Fraudulent Pharmaceuticals without first taking a detailed patient history, or without considering such history, demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know, or care, whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

79.     The Prescribing Providers also typically did not document in their examination reports whether the patients were intolerant of oral pain medications or whether oral pain medications were otherwise contraindicated thereby necessitating a prescription for a Fraudulent Topical Pain Product dispensed by JP RX.

80.     The Prescribing Providers did not document in their examination reports any reason why the Fraudulent Topical Pain Products prescribed and dispensed by JP RX were medically necessary.

81.     The Prescribing Providers also often failed to document in their follow-up examination reports whether the Fraudulent Topical Pain Products prescribed to a particular patient were used by the patient.

82.     The Prescribing Providers also often failed to document in their follow-up examination reports whether the Fraudulent Topical Pain Products provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

83.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions of the Fraudulent Pharmaceuticals that were dispensed by JP RX were based on predetermined protocols designed to exploit the Insureds for financial gain, without regard to the genuine needs of the patients.

84.     In keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to fraudulent treatment protocols and collusive agreements, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider.

85.     An individual's age, height, weight, general physical condition, location within the vehicle, and the severity of the impact will all affect the spectrum and extent of injuries to an individual in a given automobile accident, as each person in the vehicle experiences an individual mechanism of injury.

86.     It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident who were treated by the same Prescribing Provider would routinely require the same pharmaceutical products.

87.     Even so, and in keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed pursuant to predetermined protocols to maximize profits, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their examinations with a Prescribing Provider.

88.     For example,

(i)     On August 23, 2020, three Insureds – MDE, BM, and JR– were allegedly involved in the same automobile accident. Thereafter, MDE, BM, and JR all received treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York with John Greco, M.D. ("Greco").  MDE, BM, and JR were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with JP RX, after their various follow-up examinations MDE, BM, and JR were all issued prescriptions from Greco for lidocaine 5% ointment, Pennsaid 2% solution, naproxen, and cyclobenzaprine, which was dispensed and billed by JP RX.

(ii)    On September 2, 2020, two Insureds – DR and DTR – were allegedly involved in the same automobile accident. Thereafter, DR and DTR both received treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 3250 Westchester Avenue, Bronx, New York with Greco.  DR and DTR were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with JP RX, after their follow-up examinations DR and DTR were both issued prescriptions

from Greco for lidocaine 5% ointment, Pennsaid 2% solution, naproxen, and cyclobenzaprine, which was dispensed and billed by JP RX.

(iii)  On June 25, 2020, two Insureds – MG and JN– were allegedly involved in the same automobile accident. Thereafter, MG and JN both received treatment with Far Rockaway Medical, PC at a No-Fault Clinic located at 332 East 149th Street, Bronx, New York with Jean-Pierre Barakat, M.D. ("Barakat").   MG and JN were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with JP RX, after their follow-up examinations MG and JN were both issued prescriptions from Barakat for lidocaine 5% ointment which was dispensed and billed by JP RX.

(iv)  On July 5, 2020, two Insureds – OC and JFR – were allegedly involved in the same automobile accident. Thereafter, OC and JFR both received treatment with Far Rockaway Medical, PC at a No-Fault Clinic located at 332 East 149th Street, Bronx, New York with Barakat.  OC and JFR were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with JP RX, after their follow-up examinations OC and JFDR were both issued prescriptions from Barakat for lidocaine 5% ointment which was dispensed and billed by JP RX.

(v)  On August 16, 2020, two Insureds – VC and LN – were allegedly involved in the same automobile accident. Thereafter, VC and LN both received treatment with Far Rockaway Medical, PC at a No-Fault Clinic located at 332 East 149th Street, Bronx, New York with Barakat.  VC and LN were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with JP RX, after their follow-up examinations VC and LN were both issued prescriptions from Barakat for lidocaine 5% ointment which was dispensed and billed by JP RX.

89.     The Defendants' sole concern was to steer as many prescriptions as possible for the Fraudulent Pharmaceuticals to JP RX in order to maximize profits, without any regard for genuine patient care.

### B.    The Fraudulent Lidocaine Prescriptions

90.    The Prescribing Providers prescribed, and JP RX purported to dispense, medically unnecessary topical lidocaine 5% ointment, billing GEICO as much as $1,527.50 for a single tube of lidocaine ointment.

91.    The Defendants, in exchange for the payment of kickbacks or other incentives, received medically unnecessary prescriptions for lidocaine 5% ointment from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols.

92.    The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for lidocaine 5% ointment because the Defendants could readily buy these products at low cost but submit claims for reimbursement through JP RX to GEICO and other New York No-Fault insurers for huge sums based on egregiously high wholesale list prices.

93.    In keeping with the fact that these Fraudulent Topical Pain Products were prescribed and dispensed pursuant to predetermined protocols designed to maximize profits without regard to patient care, lidocaine 5% ointment was prescribed, dispensed, and billed for despite the fact that it was medically unnecessary and that there are other, less expensive, lidocaine products which are approved by the United States Food and Drug Administration ("FDA") and available over-the-counter.

94.    In further keeping with the fact that these Fraudulent Topical Pain Products were prescribed pursuant to predetermined treatment and billing protocols designed to maximize profits without regard to patient care, over 90% of all GEICO Insureds who had a prescription filled by JP RX received a lidocaine 5% ointment.

95.     Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Topical lidocaine is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

96.     Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

97.     Topical pain patches in which the primary ingredient is lidocaine are FDA approved only to treat chronic post-herpetic neuropathic pain (i.e., continued nerve pain after a patient recovers from shingles), although studies have shown that any relief these patches provide – beyond topical anesthetic relief – may be more attributable to its placebo effect rather than the pharmacological action of the patches themselves.  In fact, while application of pain patches in which the primary ingredient is lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

98.     Excessive dosage or short intervals between doses of topical lidocaine can cause adverse effects.  Patients should be instructed to strictly adhere to the recommended dosage and a single application of topical lidocaine should not exceed 5 grams.

99.     JP RX nevertheless repeatedly billed GEICO for dispensing lidocaine 5% ointment containing 5% lidocaine to numerous GEICO's Insureds.

100.    Notably, lidocaine ointments and patches with 4% lidocaine are available over-the-counter and have a similar efficacy of lidocaine 5% at a fraction of the cost.

101.    Over-the-counter products such as Icy Hot Lidocaine or Aspercreme with lidocaine, both of which contain 4% lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the range of $10 or less.

102.    Yet, the Prescribing Providers never recommended Insureds first try commonly available commercial lidocaine products to treat their patients' minor aches and pains which they sustained in fender-bender type motor vehicle accidents, instead repeatedly prescribing topical lidocaine 5% ointment that was billed to GEICO for as much as $1,527.50 for a single tube.

103.    The lidocaine 5% ointment dispensed by JP RX was prescribed pursuant to predetermined protocols and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

104.    In keeping with the fact that lidocaine 5% ointment was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, neither the prescriptions allegedly issued by the Prescribing Providers, nor the labels affixed to the prescriptions by the Pharmacy Defendants set forth sufficient instructions for the safe use of the lidocaine 5% ointment dispensed.

105.    In further keeping with the fact that lidocaine 5% ointment was being prescribed and dispensed pursuant to predetermined protocols and without regard for patient care and safety, certain Prescribing Providers and JP RX often prescribed and dispensed additional and duplicative pharmaceuticals, including both oral nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers contemporaneous to lidocaine 5% ointment.

106.    The initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the contemporaneous prescription of multiple pharmaceuticals.

107.    The lidocaine 5% ointment was also routinely prescribed at the time of the initial examination during the acute states of the Insureds' pain symptoms before Insureds even had an

opportunity to first try readily available, low-cost, over the counter lidocaine products or oral pain medication.

108.    For example:

(i)     On September 10, 2020, an Insured named TA was allegedly involved in an automobile accident.  On September 29, 2020, she sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York and underwent an initial examination with Greco.  Greco purportedly prescribed TA 200 grams of lidocaine 5% ointment and Pennsaid 2% diclofenac solution, in addition to cyclobenzaprine and naproxen.  Greco did not state the medical basis for the excessive prescriptions or advise the Insured to try over-the-counter lidocaine products. JP RX purported to deliver the prescriptions to TA six days later, on October 5, 2020.

(ii)    On September 24, 2020, an Insured named DP was allegedly involved in an automobile accident.  On September 30, 2020, he sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 3250 Westchester Avenue, Bronx, New York and underwent an initial examination with Greco. Greco purportedly prescribed DP 200 grams of lidocaine 5% ointment and Pennsaid 2% diclofenac solution, in addition to cyclobenzaprine and naproxen.  Greco did not state the medical basis for the excessive prescriptions or advise the Insured to try over-the-counter lidocaine products. JP RX purported to deliver the prescriptions to DP six days later, on October 6, 2020.

(iii)   On September 28, 2020, an Insured named RM was allegedly involved in an automobile accident.  On September 30, 2020, he sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 3250 Westchester Avenue, Bronx, New York and underwent an initial examination with Greco. Greco purportedly prescribed RM 200 grams of lidocaine 5% ointment and Pennsaid 2% diclofenac solution, in addition to cyclobenzaprine and naproxen. Greco did not state the medical basis for the excessive prescriptions or advise the Insured to try over-the-counter lidocaine products.  JP RX purported to deliver the prescriptions to RM six days later, on October 6, 2020.

(iv)    On September 30, 2020, an Insured named LR was allegedly involved in an automobile accident.  On October 6, 2020, he sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, New York and underwent an initial examination with Greco.  Greco purportedly prescribed LR 200 grams of lidocaine 5% ointment and Pennsaid 2% diclofenac solution, in addition to cyclobenzaprine and naproxen.  Greco did not state the medical basis for the excessive prescriptions or advise the

Insured to try over-the-counter lidocaine products.  JP RX purported to deliver the prescriptions to LR two days later, on October 8, 2020.

(v)     On September 30, 2020, an Insured named IW was allegedly involved in an automobile accident.  On October 2, 2020, she sought treatment with Metro Pain Specialists P.C. at a No-Fault Clinic located at 3250 Westchester Avenue, Bronx, New York and underwent an initial examination with Greco. Greco purportedly prescribed IW 200 grams of lidocaine 5% ointment and Pennsaid 2% diclofenac solution, in addition to cyclobenzaprine and naproxen. Greco did not state the medical basis for the excessive prescriptions or advise the Insured to try over-the-counter lidocaine products.  JP RX purported to deliver the prescriptions to IW six days later, on October 8, 2020.

109.    In further keeping with the fact that the lidocaine was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, any follow-up examination reports prepared by certain Prescribing Providers virtually never addressed whether the lidocaine was effective or not, to what degree, or whether the patient experienced any side effects.

110.    For example:

(i)     Insured TA saw Greco again on October 29, 2020.  Greco did not address that TA had previously been prescribed lidocaine medication, whether the lidocaine was effective or not, or whether TA experienced any side effects. Nevertheless, Greco again purported to prescribe TA 200 grams of lidocaine 5% ointment and Pennsaid 2% diclofenac solution, in addition to cyclobenzaprine and naproxen.  JP RX purported to deliver the prescriptions to TA four days later, on November 2, 2020.

(ii)    Insured DP saw Greco again on October 21, 2020.  Greco did not address whether the lidocaine was effective or not, or whether DP experienced any side effects.  Greco also recorded that DP had previously been prescribed lidocaine 5% ointment, Pennsaid 2% solution, cyclobenzaprine, naproxen, and diclofenac 3% gel, when DP had not previously received a diclofenac 3% gel prescription. Nevertheless, Greco purported to prescribe DP diclofenac 3% gel.  JP RX purported to deliver the prescription to DP six days later, on October 27, 2020.

(iii)   Greco purportedly prescribed Insured RM 200 grams of lidocaine 5% ointment and Pennsaid 2% diclofenac solution, in addition to cyclobenzaprine and naproxen, again on November 16, 2020, and JP RX purported to deliver the prescriptions to RM two days later on November 18, 2020.  RM saw Greco

again on December 21, 2020. Greco did not address whether the lidocaine was effective or not, or whether RM had experienced any side effects. Nevertheless, Greco again purported to prescribe RM 200 grams of lidocaine 5% ointment and Pennsaid 2% diclofenac solution, in addition to cyclobenzaprine and naproxen. JP RX purported to deliver the prescriptions to RM eight days later, on December 29, 2020.

(iv)   Insured LR saw Greco again on November 5, 2020. Greco did not address that LR had previously been prescribed lidocaine medication, whether the lidocaine was effective or not, or whether LR experienced any side effects. Nevertheless, Greco again purported to prescribe LR 200 grams of lidocaine 5% ointment and Pennsaid 2% diclofenac solution, in addition to cyclobenzaprine and naproxen. JP RX purported to deliver the prescriptions to LR six days later, on November 11, 2020.

(v)   Insured IW saw Greco again on November 11, 2020. Greco did not address whether the lidocaine was effective or not, or whether IW experienced any side effects. Nevertheless, Greco again purported to prescribe IW 200 grams of lidocaine 5% ointment and Pennsaid 2% diclofenac solution, in addition to cyclobenzaprine and naproxen. JP RX purported to fill the prescriptions to IW four days later, on November 15, 2020.

111.   There is no legitimate medical reason for the Prescribing Providers to prescribe large volumes of lidocaine 5% ointment to Insureds, particularly given the availability of over-the-counter medications, as well as the lack of indication for use for the Insureds.

112.   There is no legitimate medical reason why JP RX repeatedly dispensed lidocaine 5% ointment to Insureds, particularly given the legal requirements placed on pharmacists to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications based on patient comorbidities, therapeutic drug duplication, drug-drug interactions, duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

113.   The Defendants' egregious billing in predetermined patterns, coupled with the fact that the Prescribing Providers routinely failed to properly document the Insureds' use of these medications, further indicates that there is no legitimate medical reason for the Prescribing

Providers to have prescribed large volumes of these medications, and for JP RX to have dispensed these medications, to the Insureds, particularly given the potential for adverse health effects.

### C.   The Fraudulent Diclofenac Prescriptions

114.   In accordance with the fraudulent scheme discussed above, JP RX routinely billed GEICO for the exorbitantly priced topical NSAID diclofenac sodium in the form of Pennsaid 2% solution and diclofenac 3% gel (together, "Topical Diclofenac"), pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers.

115.   JP RX billed GEICO $1,891.00 for a single tube of diclofenac 3% gel dispensed to a single Insured.

116.   JP RX routinely billed GEICO $2,631.40 for a single dispenser of Pennsaid 2% solution dispensed to a single Insured.

117.   In further keeping with the fact that the Fraudulent Topical Pain Products were prescribed pursuant to predetermined treatment and billing protocols designed to maximize profits without regard to patient care, over 80% of all GEICO Insureds who had a prescription filled by JP RX received Topical Diclofenac.

118.   The Defendants, in exchange for the payment of kickbacks or other incentives, received medically unnecessary prescriptions for Topical Diclofenac from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols

119.   The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Defendants could readily buy Topical Diclofenac at low cost but submit claims for reimbursement through JP RX to GEICO and other New York No-Fault insurers for huge sums based on egregiously high wholesale list prices.

120.    In keeping with the fact that these Fraudulent Topical Pain Products were prescribed and dispensed pursuant to predetermined protocols designed to maximize profits without regard to patient care, the Topical Diclofenac products were prescribed, dispensed, and billed for despite the fact that they were medically unnecessary and that there are other, less expensive, over-the-counter, FDA-approved topical pain products available.

121.    While formulations containing 1% diclofenac are typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet, they have not been proven effective for treating strains or sprains.

122.    Moreover, the diclofenac 3% gel that the Prescribing Providers prescribed, and the Defendants dispensed and billed for, is only indicated for the treatment of actinic (or solar) keratosis – a skin condition caused by years of excessive sun exposure.  There have been no studies supporting safety of diclofenac 3% gel when applied to larger body areas.

123.    Topical Diclofenac has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Topical Diclofenac to treat musculoskeletal injuries an accepted off-label use.

124.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

125.    A "Black Box Warning" is the strictest FDA warning attached to the labeling of a prescription drug or product and is designed to call attention to serious or life-threatening risks associated with the drug or product.

126.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac

sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

127.    Notwithstanding the most common and accepted uses for Topical Diclofenac, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed NSAIDs – such as ibuprofen, or naproxen – and other Fraudulent Pharmaceuticals.

128.    Prescribing Topical Diclofenac while simultaneously prescribing or recommending the patient take oral NSAIDs is therapeutic duplication, which may result in increased risk of adverse events with no additional therapeutic benefit.

129.    Nevertheless, certain Prescribing Providers consciously prescribed and the Defendants consciously dispensed Topical Diclofenac in conjunction with other oral NSAIDs and/or other Fraudulent Topical Pain Products to numerous Insureds regardless of the nature of each Insured's injuries and the risks it posed to the Insureds' health and well-being.

130.    For example:

(i)     On January 26, 2020, an Insured named AT was allegedly involved in an automobile accident.  On October 2, 2020, AT saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 3250 Westchester Boulevard, Bronx, New York.  Greco purportedly prescribed AT Pennsaid 2% solution, as well as lidocaine 5% ointment, naproxen, and cyclobenzaprine, with no mention of the potential health risks of taking the medications together.   JP RX purportedly delivered the prescriptions to AT six days later, on October 8, 2020.

(ii)    On May 2, 2020, an Insured named BB was allegedly involved in an automobile accident.  On October 2, 2020, BB saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 3250 Westchester Boulevard, Bronx, New York.  Greco purportedly prescribed BB Pennsaid 2% solution, as well as lidocaine 5% gel, naproxen, and cyclobenzaprine, with no mention of the potential health risks of taking

the medications together.  JP RX purportedly delivered the prescriptions to BB six days later, on October 8, 2020.

(iii)  On May 31, 2020, an Insured named GD was allegedly involved in an automobile accident.  On October 5, 2020, GD saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 3250 Westchester Boulevard, Bronx, New York.  Greco purportedly prescribed GD Pennsaid 2% solution, as well as lidocaine 5% gel, naproxen, and cyclobenzaprine, with no mention of the potential health risks of taking the medications together.  JP RX purportedly delivered the prescriptions to GD three days later, on October 8, 2020.

(iv)  On June 20, 2020, an Insured named CB was allegedly involved in an automobile accident.  On September 30, 2020, CB saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 3250 Westchester Boulevard, Bronx, New York.  Greco purportedly prescribed CB Pennsaid 2% solution, as well as lidocaine 5% ointment, ibuprofen, and cyclobenzaprine, with no mention of the potential health risks of taking the medications together.  JP RX purportedly delivered the prescriptions to CB six days later, on October 6, 2020.

(v)  On July 9, 2020, an Insured named MG was allegedly involved in an automobile accident.  On September 29, 2020, MG saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 2488 Grand Concourse, Bronx, New York.  Greco purportedly prescribed MG Pennsaid 2% solution, as well as lidocaine 5% ointment, naproxen, and cyclobenzaprine, with no mention of the potential health risks of taking the medications together.  JP RX purportedly delivered the prescriptions to MG six days later, on October 5, 2020.

(vi)  On August 13, 2020, an Insured named RN was allegedly involved in an automobile accident.  On December 3, 2020, RN saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 2488 Grand Concourse, Bronx, New York.  Greco purportedly prescribed RN Pennsaid 2% solution, as well as lidocaine 5% ointment, naproxen, and cyclobenzaprine, with no mention of the potential health risks of taking the medications together.  JP RX purportedly dispensed the prescriptions five days later, on December 8, 2020.

(vii)  On August 14, 2020, an Insured named AO was allegedly involved in an automobile accident.  On December 9, 2020, AO saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 3250 Westchester Avenue, Bronx, New York.  Greco purportedly prescribed AO Pennsaid 2% solution, as well as lidocaine 5% ointment, naproxen, and cyclobenzaprine, with no mention of the potential health risks of taking the

medications together.  JP RX purportedly delivered the prescriptions to AO one day later, on December 10, 2020.

(viii) On August 16, 2020, an Insured named DR was allegedly involved in an automobile accident.  On December 9, 2020, DR saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 3250 Westchester Avenue, Bronx, New York.  Greco purportedly prescribed DR Pennsaid 2% solution, as well as lidocaine 5% ointment, naproxen, and cyclobenzaprine, with no mention of the potential health risks of taking the medications together.  JP RX purportedly delivered the prescriptions to DR one day later, on December 10, 2020.

(ix) On August 25, 2020, an Insured named CF was allegedly involved in an automobile accident.  On October 6, 2020, CF saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 2488 Grand Concourse, Bronx, New York.  Greco purportedly prescribed CF Pennsaid 2% solution, as well as lidocaine 5% ointment, naproxen, and cyclobenzaprine, with no mention of the potential health risks of taking the medications together.  JP RX purportedly delivered the prescriptions to CF two days later, on October 8, 2020.

(x) On September 4, 2020, an Insured named AC was allegedly involved in an automobile accident.  On December 8, 2020, AC saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 2488 Grand Concourse, Bronx, New York.  Greco purportedly prescribed AC Pennsaid 2% solution, as well as lidocaine 5% ointment, naproxen, and cyclobenzaprine, with no mention of the potential health risks of taking the medications together.  JP RX purportedly delivered the prescriptions to AC two days later, on December 10, 2020.

131.   The Topical Diclofenac was prescribed pursuant to predetermined treatment protocols and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

132.   In keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

133.  For example:

(i)  On May 13, 2020, an Insured named IV was allegedly involved in a motor vehicle accident.  On September 23, 2020, IV saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 3250 Westchester Avenue, Bronx, New York.  Greco purportedly prescribed IV diclofenac 3% gel, but did not indicate on his examination report that any medication was being prescribed, did not state the medical basis for the prescription, and did not advise the Insured to try over-the-counter pain products.  JP RX purportedly delivered the diclofenac 3% gel to IV four days later, on September 27, 2020.

(ii)  On May 15, 2020, an Insured named JD was allegedly involved in a motor vehicle accident.  On September 23, 2020, JD saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 3250 Westchester Avenue, Bronx, New York.  Greco purportedly prescribed JD diclofenac 3% gel, but did not indicate on his examination report that any medication was being prescribed, did not state the medical basis for the prescription, and did not advise the Insured to try over-the-counter pain products.  JP RX purportedly delivered the diclofenac 3% gel to JD four days later, on September 27, 2020.

(iii)  On June 25, 2020, an Insured named MT was allegedly involved in a motor vehicle accident.  Su Jung Lee, N.P. ("Lee") purportedly prescribed MT Pennsaid 2% solution and lidocaine 5% ointment on September 22, 2020, but there is no record of MT ever being examined by Lee and no report stating the medical basis for the prescription.  Nevertheless, JP RX purportedly dispensed the prescriptions five days later, on September 27, 2020.

(iv)  On June 26, 2020, an Insured named TR was allegedly involved in a motor vehicle accident.  On September 9, 2020, TR saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 3250 Westchester Avenue, Bronx, New York.  Greco purportedly prescribed TR diclofenac 3% gel, but did not state the medical basis for the prescription, and did not advise the Insured to try over-the-counter pain products.  JP RX purportedly delivered the diclofenac 3% gel to TR thirteen days later, on September 22, 2020.

(v)  On July 15, 2020, an Insured named JR was allegedly involved in a motor vehicle accident.  Lee purportedly prescribed JR Pennsaid 2% solution and lidocaine 5% ointment on September 30, 2020, but there is no record of JR ever being examined by Lee and no report stating the medical basis for the prescription.  Nevertheless, JP RX purportedly delivered the prescriptions to JR seven days later, on October 7, 2020.

(vi)    On July 2, 2020, an Insured named CJ was allegedly involved in a motor vehicle accident.  On September 24, 2020, CJ saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 2488 Grand Concourse, Bronx, New York.  Greco purportedly prescribed CJ diclofenac 3% gel, but his examination report indicates that he was going to prescribe lidocaine 5% ointment, naproxen, and cyclobenzaprine as well.  Additionally, he did not state the medical basis for the prescription, and did not advise the Insured to try over-the-counter pain products.   JP RX purportedly dispensed the diclofenac 3% gel to JC three days later, on September 27, 2020.

(vii)    On July 4, 2020, an Insured named DT was allegedly involved in a motor vehicle accident.  Lee purportedly prescribed DT Pennsaid 2% solution and lidocaine 5% ointment on September 22, 2020, but there is no record of DT ever being examined by Lee and no report stating the medical basis for the prescription.  Nevertheless, JP RX purportedly dispensed the prescriptions five days later, on September 27, 2020.

(viii)    On July 21, 2020, an Insured named MD was allegedly involved in a motor vehicle accident.  On September 24, 2020, MD saw Greco for a follow-up examination at Metro Pain Specialists P.C., located at a No-Fault clinic at 2488 Grand Concourse, Bronx, New York.  Greco purportedly prescribed MD diclofenac 3% gel, but his examination report indicates that he was going to prescribe lidocaine 5% ointment, naproxen, and cyclobenzaprine as well.  Additionally, he did not state the medical basis for the prescription, and did not advise the Insured to try over-the-counter pain products.   JP RX purportedly delivered the diclofenac 3% gel to MD three days later, on September 27, 2020.

(ix)    On August 1, 2020, an Insured named CR was allegedly involved in a motor vehicle accident.  Lee purportedly prescribed CR Pennsaid 2% solution and lidocaine 5% ointment on September 22, 2020, but there is no record of CR ever being examined by Lee and no report stating the medical basis for the prescription.  Nevertheless, JP RX purportedly dispensed the prescriptions five days later, on September 27, 2020.

(x)    On September 19, 2020, an Insured named LK was allegedly involved in a motor vehicle accident.  Lee purportedly prescribed LK Pennsaid 2% solution and lidocaine 5% ointment on October 14, 2020, but there is no record of LK ever being examined by Lee and no report stating the medical basis for the prescription.  Nevertheless, JP RX purportedly delivered the prescriptions to LK almost a month later, on November 12, 2020.

134.    JP RX billed GEICO hundreds of thousands of dollars for Topical Diclofenac despite its lack of proven efficacy or safety in the treatment of musculoskeletal injuries, and caused

the Prescribing Providers and Clinic Controllers to steer prescriptions to them solely to maximize its profits.

> **D.** **The Illegal, Collusive Arrangements Between JP RX and the Prescribing Providers and Clinic Controllers**

135.    To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to JP RX for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, and in exchange for kickbacks, which egregiously inflated the charges submitted to GEICO.

136.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

137.    Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, many of which treat thousands of Insureds, to have the Prescribing Providers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then direct those prescriptions to JP RX so that the Defendants could bill GEICO egregious sums.

138.    In furtherance of the scheme, the Prescribing Providers and Clinic Controllers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics and to route those prescriptions to JP RX pursuant to collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

139.     The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals despite their knowledge that: (i) the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; (ii) the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; (iii) the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and (iv) that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

140.     Here, the Defendants arranged with various No-Fault Clinics that treat thousands of Insureds to have the licensed physicians and/or their associates operating therefrom, including the Prescribing Providers, prescribe, or purport to prescribe, the medically unnecessary and illusory Fraudulent Pharmaceuticals to the Insureds, which in turn permitted the Defendants to bill GEICO huge sums under the name of JP RX.

141.     The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, despite their knowledge that the Fraudulent Pharmaceuticals were medically unnecessary and were being prescribed without regard to pharmacologic outcomes or cost and attention to fiscal responsibility.

142.     The Prescribing Providers and Clinic Controllers issued and directed the many prescriptions for the Fraudulent Pharmaceuticals to JP RX because the prescriptions were only being issued pursuant to the illegal, collusive arrangements among the Defendants and the Prescribing Providers and Clinic Controllers.

143.     The Prescribing Providers and Clinic Controllers never gave the Insureds the option to use a pharmacy of their choosing, rather the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to JP RX notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located far from JP RX and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

144.     Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to JP RX, regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.

145.     In fact, less than 8% of Insureds who received prescriptions from JP RX reside anywhere in Queens County – the county where JP RX is located.  Over 60% of Insureds who received prescriptions from JP RX resided in the Bronx.

146.     Upon information and belief, JP RX purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever having the choice of which pharmacy to use and, in many cases, without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

147.     The Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by JP RX, and to ensure that the Defendants benefitted financially from the prescriptions.

148.     The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

149.    The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to JP RX rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

150.    The Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Defendants in violation of New York law unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives such as employment at a No-Fault Clinic.

151.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to JP RX.

152.    The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

153.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentive, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by JP RX.

154.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

E.      **The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

155.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

156.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

157.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

158.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

159.    The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Pharmaceuticals because the Defendants could readily buy the Fraudulent Pharmaceuticals at low cost, but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

160.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive wholesale prices in order to inflate the billing submitted through JP RX so as to maximize their profits.

161. In support of their charges, the Defendants typically submitted an NF-3 or HCFA-1500 form which included the purported NDC numbers and corresponding charges for each drug product dispensed.

162. The NDC numbers listed on the NF-3 Form submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

163. The Defendants never submitted their actual wholesale purchase invoices demonstrating (i) how much the Defendants actually paid the supplier for the Fraudulent Pharmaceuticals, and (ii) whether the Defendants actually purchased the Fraudulent Pharmaceuticals with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

164. In fact, the Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that they dispensed, or purported to dispense, because it is not a true representation of the actual market price and is far above the actual acquisition cost for the Fraudulent Topical Pain Products.

165. Nevertheless, the Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of a wide variety of other medications that are FDA-approved, proven effective medications or commercially available over-the-counter-products.

IV. **The Defendants' Submission of Fraudulent NF-3 and HCFA-1500 Forms to GEICO**

166. To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of JP RX seeking payment for the pharmaceuticals for which it is ineligible to received payment.

167.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

    i.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were not medically necessary and were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

    ii.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants are in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous prescriptions to JP RX for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives; and

    iii.    The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants are in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

    iv.    The NF-3 Forms, HCFA-1500 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants made false statements on registration, licensing, and application documents filed on behalf of the JP RX with the NYS Pharmacy Board in order to illegally conceal the identities of all owners and controllers of JP RX and the purpose of its business, which was solely to commit fraud and exploit patients for financial gain.

V.      **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

168.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

169.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

170.    Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that the Defendants (i) have been involved in collusive, kickback arrangements to generate voluminous prescriptions pursuant to a fraudulent predetermined treatment and billing protocol, without regard to genuine patient care; (ii) prescribed and dispensed pharmaceuticals that have no efficacious value and grossly exceed the cost of other effective FDA-approved medications; and (iii) JP RX was not solely controlled by the owner listed of record and was established and operated solely to commit fraud and exploit patients for financial gain.

171.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

172.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, JP RX continues to have legal counsel pursue collection litigation against GEICO and other insurers without regard for the fact that JP RX has been engaged in fraud.  These collection proceedings can last years.

173.    The Defendants' collection efforts through numerous, separate no-fault collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a no-fault arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding,

typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceuticals to patients across numerous different No-Fault Clinics.

174.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  GEICO takes steps to timely respond to all claims and ensures that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.

The facially valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $508,900.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

175.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against JP RX and Nabiev**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

176.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

177.    There is an actual case in controversy between GEICO and JP RX regarding approximately $400,700.00 in fraudulent billing for the Fraudulent Pharmaceuticals that JP RX has submitted to GEICO.

178.    JP RX has no right to receive payment for any pending bills submitted to GEICO because it billed for Fraudulent Pharmaceuticals that were medically unnecessary and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

179.    JP RX has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to JP RX in exchange for unlawful kickbacks and other financial incentives.

180.    JP RX has no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products, including the Fraudulent Topical Pain Products, that they acquired at low cost, and caused JP RX to dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to fraudulently inflate the charges to GEICO.

181.    JP RX has no right to receive payment for any pending bills submitted to GEICO because the Defendants violated material licensing requirements and made false statements on registration, licensing, and application documents filed on behalf of the JP RX with the NYS Pharmacy Board, in order to illegally conceal the identities of all owners and controllers of JP RX and the purpose of its business, which was solely to commit fraud and exploit patients for financial gain.

182.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that JP RX has no right to receive payment for any pending bills submitted to GEICO.

**THE SECOND CLAIM FOR RELIEF**
**Against All Defendants**
**(Common Law Fraud)**

183.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

184.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals.

185.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Pharmacy Fee Schedule, when in fact the Fraudulent Pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care; (ii) in every claim, the representation that the Defendants were in compliance with all material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous prescriptions to JP RX for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives; (iii) in every claim, the representation that the Defendants were in compliance with all material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large

45

volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and (iv) in every claim, the representation that the Defendants were in compliance with all material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants made false statements on registration, licensing, and application documents filed on behalf of the JP RX with the NYS Pharmacy Board, in order to illegally conceal the identities of all owners and controllers of JP RX and the purpose of its business, which was solely to commit fraud and exploit patients for financial gain.

186.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through JP RX that were not compensable under the No-Fault Laws.

187.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $508,900.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through JP RX.

188.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

189.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE THIRD CLAIM FOR RELIEF
**Against All Defendants**
**(Unjust Enrichment)**

190.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

191.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

192.    When GEICO paid the bills and charges submitted by or on behalf of JP RX for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

193.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

194.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

195.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $508,900.00.

### THE FOURTH CLAIM FOR RELIEF
**Against Nabiev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

197.    JP RX an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

198.    Nabiev knowingly conducted and/or participated, directly or indirectly, in the conduct of JP RX's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges, seeking payments

that JP RX was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to JP RX in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the Defendants made false statements on registration, licensing, and application documents filed on behalf of the JP RX with the NYS Pharmacy Board, in order to illegally conceal the identities of all owners and controllers of JP RX and the purpose of its business, which was solely to commit fraud and exploit patients for financial gain. A sample of the fraudulent bills and corresponding mailings submitted through JP RX to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

199.    JP RX's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Nabiev operated JP RX, inasmuch as JP RX never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for JP RX to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through JP RX to the present day.

200.    JP RX is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants.  These inherently unlawful acts are taken by JP RX in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

201.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $508,900.00 pursuant to the fraudulent bills submitted by the Defendants through JP RX.

202.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE FIFTH CLAIM FOR RELIEF**
**Against Nabiev and John Doe Nos. "1" through "5"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

203.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

204.    JP RX is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

205.    Nabiev and John Doe Nos. "1" through "5" are employed by or associated with the JP RX enterprise.

206.    Nabiev  and John Doe Nos. "1" through "5" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of JP RX's affairs

through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years, that JP RX was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to JP RX in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products that they dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the Defendants made false statements on registration, licensing, and application documents filed on behalf of the JP RX with the NYS Pharmacy Board, in order to illegally conceal the identities of all owners and controllers of JP RX and the purpose of its business, which was solely to commit fraud and exploit patients for financial gain.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

207.    Nabiev and John Doe Nos. "1" through "5 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

208.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $508,900.00 pursuant to the fraudulent bills for the Fraudulent Services submitted through JP RX.

209.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.   On the First Claim For Relief against JP RX and Nabiev, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that JP RX has no right to receive payment for any pending bills, amounting to approximately $400,700.00 submitted to GEICO;

B.   On the Second Claim For Relief against Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $508,900.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.   On the Third Claim For Relief against Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $508,900.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

F.   On the Fourth Claim For Relief against Nabiev, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $508,900.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

A.      On the Fifth Claim For Relief against Nabiev and John Doe Nos. "1" through "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $508,900.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Dated: Uniondale, New York
        March 8, 2022

RIVKIN RADLER LLP

By:   _/s/ Michael A. Sirignano_____
        Michael A. Sirignano (MS 5263)
        Barry I. Levy (BL 2190)
        Priscilla D. Kam (PK 1505)
        Margaret Iocco (MI 9559)

926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*